# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>REGIS POSSINO, GROVER HENRY COLIN NIX IV, aka "Colin Nix," TARUN MENDIRATTA, IVANO ANGELASTRI, MARK HARRIS, EDON MORAL, JOSEPH SCARPELLO, JULIAN SPITARI, PETER DUNN, WILLIAM MACKEY, and JOSEPH DAVIS, aka "Joey Davis,"<br><br>　　　　　　Defendants. | Case No. CR 13-00048-SVW-3 (JEM)<br><br>**MEMORANDUM AND ORDER GRANTING GOVERNMENT'S REQUEST FOR DETENTION OF TARUN MENDIRATTA** |

　　　Before the Court is the Government's Request for Detention of Tarun Mendiratta pending trial, pursuant to 18 U.S.C. § 3142(e). The Government's Request for Detention first came on for hearing on March 14, 2013, but was continued to March 21, 2013. Testimony from FBI Special Agent Charles Koepke and Mendiratta's mother was received at the hearing, as well as documentary evidence, including wiretap intercepts. Based on all the information presented, the Court concludes that there are no conditions or combination of conditions that will reasonably assure Defendant's appearance or the safety of the

community. The Court GRANTS the Government's Request for Detention based on the findings and conclusions set forth below.

## BACKGROUND

On March 13, 2013, Defendant Tarun Mendiratta was arrested on a Central District indictment for "a pump and dump" securities fraud scheme, and charged with violations of 18 U.S.C. § 371 (conspiracy to commit securities fraud and wire fraud); 18 U.S.C. § 1348(1) (securities fraud); 15 U.S.C. §§ 78j(b), 78ff, 17 C.F.R. § 240.106-5 (securities fraud); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1350 (willful certification of false financial report); 18 U.S.C. § 1956(h) (money laundering conspiracy); and 18 U.S.C. § 1956(a)(2)(A) (international money laundering). Defendant is charged in 32 of the 37 counts in the indictment. He is also subject to a sentencing enhancement pursuant to U.S.C. § 3147 for committing the alleged offenses while on pretrial release for prior offenses of which he was subsequently convicted. A warrant is pending in Connecticut for a probation violation relating to the new charges.

## APPLICABLE LEGAL STANDARDS

Federal law traditionally has provided that a person arrested for a non-capital offense shall be granted bail. United States v. Motamedi, 767 F.2d 1403, 1405 (9th Cir. 1985). Only in rare circumstances should release be denied. Id. Doubts regarding the propriety of release shall be resolved in favor of the defendant. Id.

The Bail Reform Act of 1984, 18 U.S.C. §§ 3146-3152, provides that a criminal defendant should be released under "the least restrictive condition or combination of conditions" that will reasonably assure his appearance at trial. Id.; 18 U.S.C. § 3142(c)(1)(B). The Act authorizes detention only in those cases in which a judge finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. §

3142(e). In making his or her finding, the judge "shall" consider available information on four factors:

1. The nature and circumstances of the offense charged;
2. The weight of the evidence against the person;
3. The history and characteristics of the person; and
4. The nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.

18 U.S.C. § 3142(g)(1)-(4).

The Government bears the burden of demonstrating that a defendant poses a flight risk by a preponderance of the evidence, and by clear and convincing evidence that the defendant poses a danger to the community. Motamedi, 767 F.2d at 1406; United States v. Gebro, 948 F.2d 1118, 1121 (9th Cir. 1991); 18 U.S.C. § 3142(f) (danger to community). There are no formal evidentiary rules; the rules concerning admissibility of evidence in criminal trials are inapplicable. 18 U.S.C. § 3142(f). The Court may proceed based on proffer and hearsay. United States v. Winsor, 785 F.2d 755, 756 (9th Cir. 1986).

There is a rebuttable presumption in favor of detention for certain crimes involving violence, drugs, minors, or for which the maximum sentence is life imprisonment or death. 18 U.S.C. § 3142(f). The Government concedes that this is not a presumption case.

## DISCUSSION

The Government has presented a strong case for detention based on flight risk and danger to the community. Pretrial Services also recommends detention. Some of the defendants less culpable than Defendant have been detained based on probable sentence, weight of the evidence, flight, danger, history of non-compliance with release orders, and lack of candor.

Again, as the Government concedes, Defendant is not charged with offenses involving drugs, guns, violence, or minors that would create a presumption in favor of detention under 18 U.S.C. § 3412(f). Defendant also has offered a bail package of $500,000 in secured property and agreed to intensive supervision, home detention,

3

electronic monitoring and other conditions to mitigate the risks of non-appearance and danger to the community.

Nonetheless, the Court concludes that there are no conditions or combination of conditions so far proposed that would adequately mitigate those risks.

**I.  FLIGHT RISK**

The Government has demonstrated a preponderance of the evidence that Defendant is a flight risk and that no conditions or combination of conditions will reasonably assure his appearance at trial.

### A.  Nature And Circumstances Of The Offenses Charged

Defendant was convicted on August 10, 2009, in the Central District of California of violations of 18 U.S.C. § 371 (conspiracy to commit securities fraud) and 26 U.S.C. § 7201 (tax evasion).  See United States v. Tarun Mendiratta, CR 09-715-TJH.  The securities fraud claim alleged the issuance of shares to Mendiratta through a Form S-8 filing with the SEC for non-existing consulting services.  The unrelated tax evasion charge alleged that Mendiratta failed to pay income taxes on $329,811 in income from the sale of stock, which was concealed by depositing the money into a bank account in his wife's name and purchasing a race horse in his wife's name.  Mendiratta pleaded guilty to both counts.

Prior to his conviction, Mendiratta was granted pretrial release on a $5,000 unsecured appearance bond and made his court appearances.  Following a guilty plea, Mendiratta was sentenced to prison on April 19, 2010, for a year and a day, supervised release for three years, and a fine of $150,000.  On May 9, 2011, conditions of supervised release were ordered that included 12 months in a halfway house, modified to home detention with electronic monitoring, later modified again to include a curfew.

Starting in June 2009 and over a period of several months while on pretrial release before his sentencing and commitment for the above offenses, Defendant allegedly participated in the market manipulation scheme charged in the current indictment.  Despite a cooperating plea agreement in his prior criminal case, he placed trades in a market manipulation campaign on the same day he entered his guilty plea.  While in prison, he

allegedly made calls to his co-defendants using a smuggled, illegal cell phone. Defendant continued his involvement in the scheme for over a year while on supervised release, including telephone calls to co-defendants from a halfway house.

Mendiratta is a key figure in the indictment, which alleges illegal "pump and dump" manipulation of three stocks: Sports Endurance, Inc., Imbolis, Inc. (aka FrogAds), and Empire Post Media, Inc. Defendants allegedly obtained and concealed their control of a significant portion of a publicly traded company's stock, fraudulently inflated the price, and then sold their stock at the fraudulently inflated price, thereby profiting at the expense of the investing public in the United States and around the world. Defendants allegedly generated $18 million in illegal proceeds into overseas accounts from selling their shares in manipulated companies, including $6.8 million on the FrogAds campaign. More than 20,000 people appear to have lost money due to the alleged schemes.

The Government asserts that, given his prior conviction, the alleged offenses, and his perpetration of the alleged offenses while on pretrial release, Mendiratta faces a statutory maximum exceeding 100 years and a Guidelines sentence of life in prison. Although life time imprisonment is not assured, as the Government concedes, nonetheless Mendiratta is likely facing at least a decade in prison and possibly longer should he be convicted, which is a motivation to flee. The Ninth Circuit has found that the likely punishment may be an incentive to flee. United States v. Townsend, 897 F.2d 989, 995 (9th Cir. 1990.) ("Consideration of the nature of the offenses charged involves consideration of the penalties").

This factor, the nature and seriousness of the offenses, weighs heavily in favor of the Government.

**B.     Weight Of The Evidence**

The Ninth Circuit has stated that the weight of the evidence is the least important of the four factors in considering bail. Motamedi, 767 F.2d at 1408. A pretrial determination of guilt is neither required nor permitted. Id. The weight of the evidence is considered here

only to the extent that the defendant's perception of the likelihood of conviction provides a motivation to flee. <u>Townsend</u>, 897 F.2d at 995. This factor strongly favors the Government.

Defendant was intercepted on recorded telephone calls, on audio recordings during in person meetings, and on text message communications in regard to the alleged offenses. Statements by co-conspirators also directly link Mendiratta to the schemes. Mendiratta told an informant in a recorded conversation that Ivano Angelostri, a Swiss investment manager, maintains bank and brokerage accounts for defendants overseas, and that such accounts are useful because they cannot be seized. Angelostri described his arrangement with Mendiratta as "like money laundering," and described how separate accounts in Switzerland and Liechtenstein were used to pay stock promoters to pump up the price of stocks while others were used to sell shares. In June 2011, Mendiratta told people to start working on the FrogAds campaign, but keep his name out of it. The indictment alleges that on July 26, 2011, Mendiratta and his co-conspirators discussed six manipulation campaigns planned before the end of 2011. On August 16, 2011, Mendiratta acknowledged that the conspirators owned all of the stock of Empire Post Media. Mendiratta told a co-defendant that they were better off having the proceeds overseas in the event the transactions blow up. Mendiratta has been recorded on hundreds of intercepted telephone calls planning and executing the stock manipulations. These intercepts indicate that Defendant was involved with co-defendants in every aspect of this scheme, including choosing the securities to be manipulated, planning the manipulation campaigns, and concealing ownership of shares through nominee companies and individuals. He coordinated false promotional efforts to raise the price of the stocks, participated in cross-trading with co-defendants to create the appearance of market interest, and planned and executed efforts to profit from the manipulations and to protect the profits by concealing funds overseas.

The weight of the evidence against Mendiratta is strong. Defendant's awareness of a potentially lengthy prison sentence and the perception of a likely conviction constitute powerful motivations to flee.

**C.      The History And Characteristics Of The Person**

An assessment of the history and characteristics of the person includes "the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history and record concerning appearance at court proceedings." § 3142(g)(3)(A).

Mendiratta is of Indian descent, but is a United States citizen. He no longer holds an Indian passport, and his parents, wife and children are here in the United States. He states that he has no family or resources in India that would make India a place of refuge, and India has an extradition treaty with the United States. He is separated from his wife, but plans on getting back together with her and proposes to reside with her in Connecticut pending trial. He has bipolar disorder and is presently on medication for the condition, but no other mental or physical disabilities.

As already noted, Mendiratta has prior convictions for securities fraud and tax evasion, and he committed the alleged offenses while on pretrial release. Defendant made his court appearances in the prior criminal case, but at the time Defendant had no prior criminal history, he made only one or two appearances and quickly pleaded guilty, and he knew the sentence would be light. Here, he faces a lengthy prison sentence, and he apparently had no compunction about violating the conditions of his release in regard to the new alleged offenses. His appearances in the prior criminal case carry little weight.

Indeed, a factor in considering the history and characteristics of a person is set forth in Section 3412(g)(3)B), which asks whether a defendant, at the time the offenses occurred, was "on probation, parole or on other release pending trial, sentencing, appeal or completion of sentence for an offense under Federal, State or local law." As already observed, Mendiratta was on pretrial release, in prison, and on supervised release when the alleged offenses occurred. Although the Court views Section 3412(g)(3) as primarily relevant to the danger to the community criterion for detention, the fact that Defendant committed the alleged offenses while on pretrial release, in prison, and on supervised

release also are relevant to flight risk. A defendant who already violated his pretrial release with such impunity would not hesitate to do it again by fleeing.

Mendiratta has traveled extensively throughout the world over the last 10 years and used foreign bank accounts with substantial funds to pay stock promoters and receive the proceeds of the stock manipulations. Defendant himself has said that he made $75-80 million gross over the past 10 years. There is evidence he made $6.5 million on the transactions in the indictment. There are statements by his principal co-defendant Ivano Angelostri, who is now in Dubai, that he traded for and with Mendiratta from overseas accounts. Mendiratta also explained to another co-defendant that it was important to have the proceeds go into an overseas account in the event the scheme blew up.

Mendiratta, however, argues that his financial condition has changed, making it improbable that he could flee. He stated to Pretrial Services that his 2012 income was $250,000 to $300,000 before taxes, he owes the federal government $1.3 million in taxes, and he has over $100,000 in debts. He argues he has been borrowing money to pay his bills, which he asserts is not the indicia of someone who has substantial resources in overseas bank accounts. He argues that home detention, with electronic monitoring and supervision by his wife, mother or a private security service, would mitigate any risk of flight.

These arguments lack merit, especially the implication that his current inability to pay his living expenses means he has no foreign resources. He clearly has foreign bank accounts, and he has no incentive to bring the funds in those accounts to this country because he knows they will be seized. The indictment contains forfeiture allegations.

As for accounts overseas, defense counsel interpreted Angelostri's wiretap statement that, of the accounts he manages, about thirty percent are Mendiratta's. The Court agrees with his interpretation. Mendiratta told a co-conspirator that Angelostri manages 100 accounts, which would imply over 30 are Mendiratta's. As to the accounts used in the alleged offenses, Angelostri explained that separate accounts were used for paying promoters and for buying and selling shares. No information has been provided about the

stock promoter funds, where the money originated, and how much remains. The same is true of the share accounts.

There is also the matter of Mendiratta's close relationship with co-defendant Angelostri, which is disclosed by the wiretaps. Angelostri has managed or held funds for Mendiratta and would be a source of funds now. Mendiratta also has put his money in the name of other people, as he did with his wife with the funds from his prior securities fraud conviction.

Defendant argues that the stock manipulation schemes cost money to conduct, his net profit was much less than his gross profit, and he is now borrowing money to pay his living expenses. When Defendant asserted that his lifestyle does not suggest someone with overseas accounts, the Court invited (but did not require) him to present a declaration under oath of his assets and liabilities, including and especially his overseas assets, but he declined to do so unless the Court first agreed to grant him bail. Mendiratta has things backward. The Court hardly is going to take Defendant's assertions at face value. Not only did he engage in the alleged scheme while in prison and on supervised release, he told an accomplice to lie to authorities. In an October 6, 2011, wiretap, Mendiratta told co-defendant Possino to tell defendant Nix that "when a fucking FBI agent pulls up to tell you to rat on your client or take time, you take time and man up." He was uncooperative with his Probation Officer in Connecticut about his fiscal affairs. His intercepted statements indicate a desire to avoid detection. There certainly is no reason to credit any of Defendant's assertions when he has not been forthcoming with the information necessary to ascertain their truth. The Government has a legitimate concern about the use of Defendant's overseas accounts that he has declined to clarify that, if still substantial, would enable him to flee. It is not Defendant's lifestyle here in the United States that matters but what he may do with funds maintained abroad by Angelostri should he flee.

Nor does the Court believe that conditions can be imposed that would mitigate Defendant's risk of flight. Essentially, Mendiratta argues that home confinement at his wife's house in Connecticut or at his parents' house in New York would be sufficient to assure his

Court appearances. Confinement at his wife's house in Connecticut plainly is insufficient to mitigate the flight risk. His wife is behind in payments on the mortgage and has to care for two children. GPS monitoring is no assurance against flight. Confinement at his mother's house is also insufficient. Mendiratta's wife and mother have not prevented Mendiratta's allegedly illegal activities in the past. There is no reason to believe that they could prevent him from fleeing should he choose to do so.

There also was discussion about Mendiratta renting an apartment here in Los Angeles, with supervision by a private security service, similar to the arrangement for convicted embezzler Bernie Madoff. Mendiratta, however, speaks only of a security service to escort him to the courthouse, and apparently he would be supervised by his mother at other times. This is not the 24-hour monitoring that Bernie Madoff's wife funded. United States v. Madoff, 586 F. Supp. 2d 240, 244 (S.D.N.Y. 2009). The Court assumes Defendant cannot fund such expensive monitoring, in view of his asserted inability to pay his current expenses. Thus, at present, the Court finds the level of supervision inadequate to offset the flight risk.

The Court also finds that the bail resources are insufficient to mitigate against the risk of flight. Mendiratta proposes a fully secured bond of $500,000 supported by properties owned by his parents and wife. Mendiratta asserts he would not endanger these assets and bring harm to his wife, children and parents by fleeing, but the Court does not believe he would be deterred from flight in view of the likely lengthy prison sentence, or that he could not make good on a loss of that amount, such as through his friend Angelostri. Defendant cites the case of Kenneth Lay, who was released on a bond of $500,000. However, Lay had no prior criminal convictions or violations of conditions of release, and the case against him was of first impression. There are numerous cases in this Circuit where substantial secured bonds were offered and rejected as insufficient in the circumstances of those cases to ameliorate the risks posed and secure the defendants' appearances at trial. See e.g., United States v. Hir, 517 F.3d 1081, 1085 (9th Cir. 2008) ($600,000 secured bond inadequate); United States v. Cohen, 2010 WL 5387757 (N.D. Cal. Dec. 20, 2010)

($575,000 secured bond inadequate); United States v. Pilayvan, CV 07-222-SVW (C.D. Cal. 2007) ($500,000 secured bond inadequate); United States v. Ward, 63 F. Supp. 2d 1203, 1215 (C.D. Cal. 1999) ($1.6 million secured bond inadequate). In cases where defendants had access to significant assets, foreign ties and means to flee abroad, substantial secured bonds were posted. Madoff, 586 F. Supp. 2d at 244 ($10 million), United States v. Sabhnani, 493 F.3d 63, 77 (2d Cir. 2007) ($4.5 million); United States v. Khashoggi, 717 F. Supp. 1048 (S.D.N.Y. 1989) ($10 million); United States v. Chang, Case No. CR10-1157-GW (C.D. Cal. 2010) ($4.5 million). Defendants in Madoff, Sabhani and Khasshagi were released subject to further monitoring of their assets, round the clock supervision by private security, or other forms of extraordinary supervision. Defendant may yet be able to present an acceptable bail and supervision proposal, but for now both are inadequate to allay the risk of flight.

The Government has demonstrated by a preponderance of the evidence that Defendant is a flight risk, based on prior criminal history, apparent massive violation of his pretrial release, the weight of the evidence, Defendant's perception of a lengthy prison sentence, extensive foreign travel, overseas accounts and resources, lack of candor, and insufficient bail resources, supervision and conditions of confinement. There are no conditions and or combination of conditions so far presented that would reasonably assure Defendant's presence at trial.

## II. DANGER TO THE COMMUNITY

Section 3412(g)(4) directs the Court to consider the nature and seriousness of the danger to the community posed by a defendant's release. Mendiratta has previous convictions for securities fraud and tax evasion. He engaged in the alleged offenses in this case while on pretrial release, in prison with the aid of a smuggled cellphone, and on supervised release for the prior convictions. The new offenses were part of a widespread, long running market manipulation scheme that defrauded over 20,000 investors here and abroad. The Government contends that Mendiratta's propensity to commit further violations makes him a continuing danger to the community, which the proposed conditions of release

11

and pretrial supervision cannot mitigate. The Court agrees. The facts presented by the Government are sufficient to meet the clear and convincing evidence test for danger to the community.

Mendiratta argues that economic danger to the community cannot be a basis for pretrial detention under the Bail Reform Act as a matter of law. The Court rejects this argument. The Ninth Circuit held in United States v. Reynolds, 956 F.2d 192, 192-93 (9th Cir. 1992), that danger to the community may encompass pecuniary or economic harm, citing United States v. Provenzano, 605 F.2d 85, 95 (3d Cir. 1979), and United States v. Parr, 399 F. Supp. 883, 888 (W.D. Tex. 1975). Defendant points out that Reynolds addressed bail pending appeal after conviction, but in United States v. Cohen, 2010 U.S. Dist. LEXIS 138508, at *26-*27 (N.D. Cal. Dec. 20, 2010), Judge Sandra Illston upheld a Magistrate Judge's pretrial detention order based on economic harm where "fraudulent activity is ongoing or defendant has a propensity to continue fraudulent activity." Id.

The best discussion of economic danger is found in Madoff, 586 F. Supp. 2d at 250-54. Although recognizing that pretrial detention for danger to the community primarily has occurred in connection with felonies enumerated in 18 U.S.C. § 3412(f), the Madoff court accepted that, in certain circumstances, economic or pecuniary harm "may give rise to a consideration for danger for purposes of detention, either prior to trial or where the convicted awaits appeal." Id. at 253. Madoff specifically rejected any pretrial/post-trial distinction, although recognizing that the presumption of innocence at the pretrial stage is a factor to be considered. Id. at 252, esp. n.10.

The Court concludes that economic danger is a proper consideration in pretrial bail determinations, based on Reynolds, Cohen and Madoff. If Congress had meant to limit detention to the offenses listed in 18 U.S.C. § 3412(f), it could have said so. The presumption of detention for § 3412(f) offenses is not inconsistent with proving economic danger by clear and convincing evidence. In the absence of clear statutory guidance, the Court declines to limit pretrial detention for economic danger only to those offenses listed in

§ 3412(f).  Plaintiff's lower court cases to the contrary are neither binding nor persuasive.  The Court finds Madoff more persuasive.

As Madoff observes, most cases considering economic danger either find the evidence lacking or ultimately denied bail based on flight risk.  Id. at 254-55, esp. n.14.  In this case, however, the Government has met its burden of proving by clear and convincing evidence that Defendant's release would pose an economic danger to the community pursuant to 18 U.S.C. § 3412(g)(4).  The Government plainly has established that Defendant has a propensity to continue engaging in fraudulent activity.   Defendant committed the alleged offenses in the indictment while on pretrial release, in prison, and on supervised release.  Not even incarceration stopped Defendant from engaging in alleged widespread securities fraud.

Section 3412(g)(3)(B) identifies as a factor to be considered in determining bail or detention:

> . . . whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State or local law . . .

The Court invited the parties to comment on or submit case authority on Section 3412(g)(3)(B) and its relationship to the clear and convincing evidence standard, but neither did, probably because there is none.  The Court also found no authority.  Nonetheless, the Court does not and should not view this provision as mere surplusage.  The provision would appear to apply primarily to danger.  Section 3412(g)(3) concerns the defendant's history and characteristics and subsection (B) appears to be a way of directing the Court's attention to a defendant's propensity to commit further acts that endanger the community and to his or her general disregard of rules and laws and Court imposed orders.  The Court concludes that Section 3412(g)(3)(B), where it is satisfied as it is here, weighs heavily in favor of a finding of economic danger to the community.

Defendant argues that his current economic conditions make it improbable he would or could engage in further fraudulent activity. He points out that his confederates, whose assistance was needed to carry out a large, complex market manipulation scheme, also were arrested and many detained. Defendant omits to mention that his principal co-conspirator Angelostri, also a defendant, is in Dubai and has not been apprehended. There has been discussion about whether Dubai (United Arab Emirates) would extradite Mendiratta, but Angelostri has not been extradited. Should Mendiratta flee and join Angelostri, who has managed Mendiratta's accounts, nothing would deter them from further market manipulation schemes. Angelostri and Mendiratta undoubtedly know and could enlist people other than those indicted to participate in additional schemes. In any event, nothing would prevent Mendiratta from engaging in smaller scale schemes like the one for which he was convicted or schemes that do not involve penny stocks.

Nor would the proposed conditions of confinement assure against further fraudulent activity. Mendiratta was able to participate in the alleged offenses with a smuggled cell phone while in prison. Prison did not deter him and the Court does not believe his wife or mother will be able to do so either.

As the Government says, if ever there was a case where economic danger warrants detention, this is it. The Government has demonstrated by clear and convincing evidence that Defendant would be a danger to the community if released.

The Government has demonstrated that there are no conditions or combination of conditions that will reasonably assure the appearance of the Defendant or the safety of the community. Accordingly, IT IS HEREBY ORDERED that the Government's Request for Detention be GRANTED.

**IT IS SO ORDERED.**

DATED: <u>April 8, 2013</u>         <u>        */s/ John E. McDermott*        </u>
                                                JOHN E. MCDERMOTT
                                         UNITED STATES MAGISTRATE JUDGE